**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SHARON-LEE REAGAN-DIAZ,

               Plaintiff,

               v.

JEFF SESSIONS, United States Attorney
General,[1]

               Defendant.

Civil Action No. 14-01805 (BAH)

Chief Judge Beryl A. Howell

**MEMORANDUM OPINION**

The plaintiff, Sharon-Lee Reagan-Diaz, an employee of the Federal Bureau of

Investigation ("FBI"), brings this suit against the Attorney General, in his official capacity,

alleging that the FBI denied her a reasonable accommodation, and discriminated and retaliated

against her, based on her disability, in violation of the Rehabilitation Act of 1973, 29 U.S.C.

§ 701 *et seq.*  First Am. Compl. ("FAC"), ¶ 4, ECF No. 12.  After the plaintiff sustained a

debilitating workplace injury in September 2011, the FBI denied her request for what she alleges

was a reasonable accommodation of working for no more than two hours per day.  She then

received worker's compensation during her recuperation, until her return to work, on a part-time

basis, in May 2013.  She currently remains gainfully employed on a full-time basis by the FBI.

The plaintiff contends that, in reprisal for her equal employment opportunity ("EEO") activity,

she was improperly denied two awards in 2012 and 2013, during which periods she was either

recuperating or working part-time.  Pending before the Court is the defendant's Motion to

Dismiss and for Summary Judgment, ("Def.'s Mot."), ECF No. 25, pursuant to Federal Rules of

---

[1]      The plaintiff originally named former Attorney General Eric Holder, Jr., as the defendant.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court automatically substitutes his successor as the new defendant.

Civil Procedure 12(b)(1) and 56.[2]  For the reasons set forth below, the defendant's motion is

granted.

## I.      BACKGROUND

### A.      The Plaintiff's 2011 Injury and Requests to Return to Work

In 2011, the plaintiff was employed as a GS-14 Management and Program Analyst in the

Performance Management Unit ("PMU") of the Resource Planning Office ("RPO") of the FBI.

FAC ¶¶ 17, 80.  The plaintiff was assigned full-time to the FBI's "Sentinel" program, a team

project to develop the web-based "Sentinel" application, which is "the FBI's current electronic

case management system."  *Id.* ¶¶ 18-19.  The job was demanding, in a "fast paced

environment," that required the plaintiff frequently to work nine or ten hour days to finish her

work, and to attend numerous, often "impromptu," meetings.  Def.'s Mot., Ex. 4, Deposition of

Sharon-Lee Reagan-Diaz ("Pl.'s Dep.") at 25:2-4, 29:22-30, 31:9-13, 36:14-18, 45:9-10, 46:23-

47:2, 48:7-20, 59:11-17, ECF No. 25-8.  Additionally, much of the Sentinel team's work was

conducted on a classified network, and thus could not be performed outside FBI facilities.  Def.'s

Mot. Decl. of Gordon D. Bitko, Chief Information Officer, FBI ¶ 9, ECF No. 25-3.

On September 7, 2011, while at work, the plaintiff suffered a serious injury, the details of

which are not disclosed in the record, and was placed on medical leave.  FAC ¶ 2.  After her

injury, the plaintiff was diagnosed with Reflex Sympathetic Dystrophy, or Complex Regional

Pain Syndrome, a condition causing chronic, disabling pain in her extremities that affected the

functioning of her circulatory and musculoskeletal systems and initially prevented her from

engaging in routine activities such as walking or lifting objects.  *Id.* ¶ 27.  From the date of her

---

[2]      The plaintiff has also filed a Motion for Leave to File a Sur-Reply in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Sur-Reply"), ECF No. 39.  This motion is granted to give full consideration to the parties' arguments.

injury to May 9, 2013, the plaintiff received workers' compensation payments pursuant to the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. §§ 8101 *et seq.* Def.'s Mot., Ex. 1 at FBI 1206, ECF No. 25-5.

Several months after the injury, in January 2012, the plaintiff contacted RPO about returning to work and requested permission to telecommute. FAC ¶ 30. In the months that followed, the plaintiff and various FBI personnel engaged in a series of communications regarding the processes and requirements for her return to work. Initially, some supervisors suggested to the plaintiff that they merely had to grant her a "reasonable accommodation." For example, when the plaintiff first requested to return to work in January 2012, her direct supervisor, Gordon Bitko, told her that she needed to be in the office for more than just two hours, proposing a "reasonable accommodation" that the plaintiff work four hours in the office per day, with the rest completed at home. *Id.*

The situation was soon clarified, however, that the plaintiff could not receive a "reasonable accommodation" while still receiving worker's compensation payments. On January 11, 2012, Elizabeth Stoddard, a Supervisor in RPO, Def.'s Mot., Ex. 6, Deposition of Elizabeth Stoddard, at 10:16-18, ECF No. 25-10, explained to Bitko that "[e]mployees on Worker's Compensation do not go through the Reasonable Accommodation Process. Instead they go through a process that is facilitated by [the Worker's Compensation Unit ("WCU")] called Alternative Work Assignments ("AWA")," Def.'s Mot., Ex. 14 at FBI 1671, ECF No. 25-18; *see also* Pl.'s Corrected Opp'n Def.'s Mot. ("Pl.'s Opp'n") at 4, ECF No. 34 ("The FBI decided that Plaintiff would not go through the 'Reasonable Accommodation Process,' but instead would proceed under the Alterative Work Assignment ('AWA') process of workers' compensation directed by Michael Huff." (citations omitted)). Under the AWA process, Michael

Huff, the Unit Chief of the FBI's WCU, would have to draft an AWA "job offer" for the plaintiff and submit it to the Department of Labor ("DOL") for approval.[3]  Pl.'s Opp'n at 4 (citing Pl.'s Opp'n, Ex. 6, Deposition of Michael Huff, Unit Chief, Workplace Injury Liaison Unit, FBI ("Huff Dep."), at 159-61, ECF No. 31-6).  As explained by Stoddard, the AWA process is similar to the "reasonable accommodation" process, but the plaintiff would be compensated by DOL instead of the FBI.  Def.'s Mot., Ex. 14 at FBI 1671.  As part of this process, the plaintiff had to communicate to WCU about the job activities she could and could not perform given her medical condition.  *Id.*

On March 22, 2012, Stoddard advised the plaintiff via email that she could start working once the RPO had completed the AWA process in coordination with WCU, stating that "[t]here are several projects that we are eager to get you engaged in as soon as you're able and we've complete [sic] the appropriate processes."  Def.'s Mot., Ex. 15 at FBI 2206-07, ECF No. 25-19; *see also* Pl.'s Opp'n, Ex. 26 at FBI 2257, ECF No. 31-26.  Stoddard listed a number of job duties that they were hoping the plaintiff could "support."  Pl.'s Opp'n, Ex. 26 at FBI 2257.  Stoddard asked the plaintiff in the March 22 email to confirm the work activities she could perform given her current medical condition, telling her that "[t]o be clear, my understanding is that [Huff], [Bitko], and I all need positive confirmation from you that you feel comfortable in performing these roles; otherwise we would want to re-evaluate them such that you are comfortable."  Def.'s Mot., Ex. 15 at FBI 2207.  One week later, on March 29, 2012, the plaintiff responded, but stated only that she was having email problems, asked to have messages sent to another email address,

---

[3]       In his deposition, Huff explains that his unit changed its name from the "Workmans' Compensation Office" and "Workers' Comp Unit" to the "Workplace Injury Liaison Unit."  Huff Dep. at 9:9-14.  For ease of reference, and because the parties refer to the office as the "Workers' Compensation Unit," the office is referred to in this opinion as the "Workers' Compensation Unit" or "WCU."

and explained that she would "proceed to review the work duties" and would let Stoddard know if she had any questions.  *Id.* at FBI 2206.

Several weeks later, on April 19, 2012, RPO Assistant Director David Schlendorf informed the plaintiff that they were still "waiting to hear back from [the plaintiff] about . . . the work duties." *Id.* at FBI 2206.  The plaintiff responded that she had, in fact, replied to Stoddard's March 22 email "regarding the work duties," stating that "[a]t the time [Stoddard] sent me the e-mail with the work duties I din't [sic] have any questions" and that "I am sure once we have an oficial [sic] starting work date we will need to regroup and see if these work duties need to be updated." *Id.* at FBI 2205-06.  Stoddard and Huff then expressed confusion to one another, as neither of them had seen a response from the plaintiff specifically regarding the job duties. *Id.* at 2205.  Stoddard wrote to Huff, stating that "[t]he only response I saw to the work duties" was the plaintiff's March 29 email and that to Stoddard's knowledge, the plaintiff had "not positively confirmed that the work duties were okay and appropriate for her medical circumstances, as requested." *Id.*

Five days later, Huff wrote to Schlendorf, telling him that "[t]here is nothing more [Schlendorf] or anyone else in RPO needs to do" and that they were still "waiting on [the plaintiff] to provide a response to [Stoddard's] email and provide [Huff's] office with updated medical [information] from her doctor and a completed safety check list."  Def.'s Mot., Ex. 16 at FBI 1741, ECF No. 25-20.  Huff explained that "[o]nce these three issues are resolved, then [they could] proceed with making a light duty job offer to [the plaintiff]." *Id.*  Yet, no evidence is in the record that the plaintiff ever substantively responded to the March 22 email from Stoddard confirming the work duties she was comfortable performing.

On May 18, 2012, however, the plaintiff again wrote in an email to Huff that she had "been cleared to work 2 hours a day 5 days a week close to home on a trial basis." Def.'s Mot., Ex. 18 at FBI 1838, ECF No. 25-22. Huff responded by referring to an apparent oral conversation the plaintiff had with Huff two weeks earlier on May 3, 2012. *Id.* According to Huff's email, in this conversation, Huff and the plaintiff discussed that they would have to wait until the plaintiff's doctor cleared her to work for four hours per day and that the plaintiff had stopped having, in her terms, "bad days."[4]  *Id.* at FBI 1838; FAC ¶¶ 43-44. The plaintiff responded to Huff's email by reiterating her desire to return to work "on a gradual basis." Def.'s Mot., Ex. 18 at FBI 1837. Huff replied that he had discussed the matter with RPO leadership, including Schlendorf, resulting in the "unanimous" decision that the plaintiff "need[ed] to concentrate on recovery efforts regarding [her] medical condition," noting, in particular, that the plaintiff was still having "bad days" when she could not "function well." *Id.* at FBI 1836. Huff explained that the plaintiff's "bad days" issue is "not taken into account within [DOL's AWA] process," and had the "potential to create a great deal of stress on [the plaintiff] as it could lead to a denial of benefits if [she] [could not] continue to work the formalized return to work program under the [DOL] rules and regulations." *Id.* Huff advised that everyone "agreed that [the plaintiff] need[ed] to continue [her] recovery program and the most important issue [was her] long term health and well being" and that "[c]oming back to work at this point could jeopardize all the hard work and positive gains [she] ha[d] made thus far." *Id.* Huff concluded that once the plaintiff's doctor had cleared her to work for at least four hours per day and her "issue with bad days and good days ha[d] been resolved as much as possible," WCU would "be happy to develop an alternative work assignment to meet [her] medical restrictions." *Id.* Huff then explained to

---

[4]      According to Huff, on these "bad days," the plaintiff told him she was "not able to get out of bed and work." Def.'s Mot., Ex. 13 at FBI 2919, ECF No. 25-17; *see also id.*, Ex. 19 at FBI 2250-51.

Bitko that WCU could not make a "suitable offer for . . . work as [the plaintiff] [could] only work 2 hours per day, and she, by her own admittance, [did] not know when she [would] have good and bad days." *Id.* at 1835.

On July 16, 2012, Huff wrote to Schlendorf, Stoddard, and Bitko, telling them that he had spoken to the plaintiff about Stoddard's March 22 email on April 27 and May 3. Def.'s Mot., Ex. 19 at FBI 2250-51, ECF No. 25-23. According to Huff, the plaintiff stated that she could not "comment [sic] to performing any of the duties in the March 22, 2012, email as she does not feel comfortable trying to make deadlines with her work," since she has "good days and bad days, [when] she is not able to get out of bed and work on the bad days," and, consequently, she did not make "a commitment to work specific job duties as outlined in the March 22, 2012 e-mail." *Id.* at FBI 2250. Huff further explained that he could not make an AWA job offer based on "good days and bad days," and that in order for him to write an offer, he had to have a "list of duties that [the plaintiff would] be performing." *Id.* Since Huff could not make a job offer under FECA, Huff referred the plaintiff to Lynn Hoffman at FBI's [Office of Equal Employment Opportunity Affair's ("OEEOA")] Office of Reasonable Accommodation." *Id.* at 2250-51.

Rodney Yelder, a Program Manager at OEEOA, however, refused to adjudicate the plaintiff's request for a reasonable accommodation while she was still on workers' compensation. Def.'s Mot., Ex. 20, at FBI 1583, ECF No. 25-24. On August 13, 2012, Yelder informed the plaintiff that "[b]ased on the fact that [she was] currently on worker's comp. with no work return date, a reasonable accommodation determination c[ould not] be made on [her] case at th[at] time." *Id.* On August 17, Yelder also told Huff that he would explain to the plaintiff that an individual would have to meet the requirements of "[Huff's] program" before OEEOA could "provide a reasonable accommodation" and that "[i]t is not reasonable to provide

an accommodation to an employee on workers comp to come back to work when the worker's comp unit's requirements have not been met."  Def.'s Mot., Ex. 21, at FBI 2269, ECF No. 25-25.

On September 28, 2012, the plaintiff contacted Huff again, claiming that DOL's Claims Examiner in her case, Shanell Davis, would "approve" her request to "return to work 2 hours per day, 5 days per week."  Def.'s Mot., Ex. 22, at FBI 2314-15, ECF No. 25-26.  On October 5, 2012, however, Huff clarified in an email to David Wade, the Chief Medical Officer at the FBI, that he spoke to a Supervisory Claims Examiner at DOL, Stephanie Stone, who told him that Davis had, in fact, not approved the plaintiff's request and instead had told the plaintiff "that DOL does not approve 2 hour job offers as suitable."  *Id.* at 2313.  Wade wrote to the plaintiff, explaining that he had discovered that DOL had required the plaintiff to undergo a Second Opinion Examination in May 2012.  Pl.'s Opp'n, Ex. 18 at FBI 2330, ECF No. 31-18. According to Wade, the Second Opinion Examiner concluded that the plaintiff could work six hours per day.  *Id.* at FBI 2330.  Accordingly, because of the conflict between the plaintiff's attending physician and the second opinion examiner, a "third evaluation [was] needed to resolve the conflicting opinions."  *Id.*  The record is unclear whether a third medical evaluation was ever scheduled and completed.

Six months later, on May 21, 2013, after the plaintiff's workers' compensation payments had ceased, the FBI's Reasonable Accommodations Committee ("RAC") convened and recommended a part-time schedule of 20 hours per week as a reasonable accommodation for the plaintiff.  Def.'s Mot., Ex. 2 at FBI 1462, ECF No. 25-6.  The plaintiff first reported back to work on at FBI Headquarters on May 20, 2013, accepting the RAC's part-time schedule as offered on May 24.  Def.'s Ans. Pl.'s Am. Compl. ("Def.'s Ans.") ¶ 71, ECF No. 16; Def.'s Mot., Ex. 3 at FBI 1522.

Over the next several weeks, the plaintiff repeatedly requested permission to work from an office closer to home, FAC ¶¶ 74-75, and on July 16, after a June 27 incident during a fire drill where the plaintiff fainted and was taken to the FBI's Health Services Unit, the FBI determined that she was unable to meet work attendance requirements at FBI Headquarters, *Id.* ¶ 76; Def.'s Ans. ¶ 78.  On August 21, 2013, the plaintiff began working in the Chantilly, Virginia, office of the FBI Cyber Division, and by January 2014 her work was full-time.  Def.'s Ans. ¶ 80.

### B.       The 2012 Director's Award and 2013 Attorney General's Award

While the plaintiff was still on leave, some of her coworkers on the Sentinel project team were selected as recipients of the 2012 Director's Award for Outstanding Information Management.  FAC ¶ 55.  Although the plaintiff alleges that she was on the initial list of employees considered for the award, she did not receive it.  *Id.* ¶¶ 55-57.  Robert Blake, a Special Assistant who managed the Sentinel project, *Id.* ¶ 34, selected the initial slate of nominees from the Sentinel project for the award, *see* Def.'s Mot., Ex. 26, Sworn Statement of Robert Blake, Special Assistant, Information Technology Management Division, FBI ("Blake Statement") at FBI 61-64, ECF No. 25-30.  According to Blake, he did not nominate the plaintiff for the 2012 Director's Award because he did not feel that the plaintiff's contribution to the team was critical to the success of the project, noting that, in his view, the plaintiff was "mainly a conduit for the flow of information between the team and one entity," and "[s]he was not one of the managers overseeing the details of the project or one of the designers or programmers who created Sentinel."  *Id.* at 64.  Moreover, Blake cited the fact that the plaintiff's most recent contribution to the team was in September 2011, nearly a year before the project was completed in July 2012.  *Id.*  Moreover, Blake understood that "[g]roup nominations [for the award] are

limited to 15 nominees." *Id.* at 63.  Jeffrey Johnson, the Assistant Director of the Information

Technology Management Division at the FBI, who made the final decision about nominees for

the award, agreed with Blake.  *See* Def.'s Mot., Ex. 23 ("Blake Dep.") at 30:14-15, ECF No. 25-

27, Ex. 27, Sworn Statement of Jeffrey C. Johnson, Assistant Director, Information Technology

Management Division, FBI ("Johnson Statement"), at FBI 58-59, ECF No. 25-31.  Shortly

before filing this action, in October 2014, the plaintiff also learned that a group of her co-workers

had received another award, the 2013 Attorney General's Award for Excellence in Information

Technology ("AG's Award").  FAC ¶ 66.

        **C.**    **Procedural History**

        Beginning as early as February 2012, when the plaintiff requested informal counseling

when her first request to return to work was denied, and continuing until she filed this action, the

plaintiff had several interactions with the FBI's OEEOA.  FAC ¶¶ 11-16.  On April 13, 2012, she

filed her first formal EEO complaint, *id.* ¶ 37, alleging discrimination and retaliation because of

the FBI's denial of her request to return to work for two hours per day, *see* Def.'s Mot., Decl. of

Jessika Rovell, Supervisory Attorney-Advisor, Unit Chief, Complaint's Processing Unit,

OEEOA, FBI ("Rovell Decl."), at ¶ 4, ECF No. 25-4.  On October 25, 2012, the plaintiff filed

her second EEO complaint, alleging discrimination as well as retaliation for prior EEO activity

when she became aware that she did not receive the 2012 Director's Award.  *Id.* ¶ 5.  The FBI

completed two Reports of Investigations, which were received by the plaintiff on September 13,

2012 and April 11, 2013, respectively.  FAC ¶ 11; *see also* Def.'s Reply Supp. Mot. Summ. J. &

Mot. Dismiss ("Def.'s Reply"), Ex. 44 (excerpts of the second administrative Report of

Investigation), ECF No. 38-9.  She subsequently withdrew her hearing requests on July 31, 2014,

FAC ¶ 13, and her cases were dismissed, Rovell Decl. ¶¶ 6-7.

Following the OEEOA's final action of dismissal for both matters, the plaintiff, on

August 28, 2014, filed the instant lawsuit, alleging claims of failure to provide a reasonable

accommodation, disparate treatment because of a disability, and a claim of retaliation because of

protected activity, *see* FAC ¶ 4, and an amended complaint in March 2015, to add a third claim

of retaliation based on her exclusion, in the Fall of 2014, from the nominee list for the 2013

Attorney General's Award, *see* Pl.'s Opp'n at 44; FAC ¶ 137.  Initially, the Court issued a

Scheduling Order closing discovery by October 9, 2015.  *See* Minute Order, June 8, 2015.  After

two extensions were granted, discovery closed on April 8, 2016.  Minute Order, December 29,

2015.  Two months later, on June 20, 2016, the defendant filed the instant motion.

## II.      LEGAL STANDARDS

### A.      Motion for Summary Judgment

Federal Rule of Civil Procedure Rule 56 provides that summary judgment shall be

granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party

bears the burden of demonstrating the "absence of a genuine issue of material fact" in dispute,

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present

specific facts supported by materials in the record that would be admissible at trial and that could

enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc. ("Liberty

Lobby")*, 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting

that, on summary judgment, appropriate inquiry is "whether, on the evidence so viewed, 'a

reasonable jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477

U.S. at 248)).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," id. at 1863 (quoting *Liberty Lobby*, 477 U.S. at 255 (alteration in original)).  Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000) (internal quotation marks omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 295-96 (D.C. Cir. 2015).  In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props, Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249–50 (citations omitted).  Moreover, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. at 323.  In that situation, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id*.  The Court

is only required to consider the materials explicitly cited by the parties, but may on its own

accord consider "other materials in the record."  FED. R. CIV. P. 56(c)(3).

### B.     Rule 12(b)(1)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the

plaintiff bears the burden of demonstrating the court's subject-matter jurisdiction over his claim.

*Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  "'Federal courts are courts of limited

jurisdiction,' possessing 'only that power authorized by Constitution and statute.'"  *Gunn v.

Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511

U.S. 375, 377 (1994)).  Indeed, federal courts are "forbidden . . . from acting beyond our

authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and, therefore, have

"an affirmative obligation 'to consider whether the constitutional and statutory authority exist for

us to hear each dispute,'" *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C.

Cir. 1996) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992)).  Absent

subject matter jurisdiction over a case, the court must dismiss it.  *Arbaugh v. Y & H Corp.*, 546

U.S. 500, 506–07 (2006); FED. R. CIV. P. 12(h)(3).

When considering a motion to dismiss under Rule 12(b)(1), the court must accept as true

all uncontroverted material factual allegations contained in the complaint and "'construe the

complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the

facts alleged' and upon such facts determine jurisdictional questions."  *Am. Nat'l Ins. Co. v.

FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972

(D.C. Cir. 2005)).  When necessary, the court may "'undertake an independent investigation to

assure itself of its own subject matter jurisdiction,'" *Settles v. U.S. Parole Comm'n*, 429 F.3d

1098, 1107 (D.C. Cir. 2005) (quoting *Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987)),

and consider facts developed in the record beyond the complaint, *id.; see also Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (in disposing of motion to dismiss for lack of subject matter jurisdiction, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts").  To do so, "the district court may consider materials outside the pleadings."  *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also Belhas v. Ya'alon*, 515 F.3d 1279, 1281 (D.C. Cir. 2008) (examining materials outside the pleadings in ruling on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction); *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (noting that courts may consider materials outside the pleadings in ruling on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction).

## III.    DISCUSSION

The plaintiff asserts three claims: in Count I, she claims failure to accommodate, in violation of the Rehabilitation Act, FAC ¶¶ 81-100; in Count II, she alleges disparate treatment based on the defendant's refusal to allow her to return to work on a reduced schedule of two hours per day, *id.* ¶¶ 101-13; and in Count III, she alleges retaliation stemming from the FBI not considering her for awards in 2012 and 2013, *id.* ¶¶ 114-40.  Each of the plaintiff's claims is considered *seriatim* below.

### A.    Count I: Failure to Accommodate

The plaintiff alleges that the FBI violated the Rehabilitation Act by failing to provide a reasonable accommodation for her disability.  The defendant responds by primarily arguing that the plaintiff could not have performed the essential functions of her position with or without the reasonable accommodations requested by the plaintiff.  Moreover, the defendant also notes that

the FBI could not have provided a reasonable accommodation for the plaintiff until she returned

to work, and "[t]he reason Plaintiff did not return to work sooner is because the Department of

Labor would not approve a two-hour per day work schedule," and the "Plaintiff had not

confirmed the job duties she would perform upon her return."  Def.'s Statement of Undisputed

Material Facts ("Def.'s SUMF") ¶ 30, ECF No. 25 (citing Def.'s Mot., Ex. 14 at FBI 1671, Ex.

15 at FBI 2206-07, Ex. 16 at FBI 1741, Ex. 17 at FBI 1795, Ex. 18 at FBI 1838, Ex. 19 at FBI

2250-51, Ex. 20 at FBI 1583, Ex. 21 at FBI 2269, Ex. 22 at FBI 2313).  The legal standard for a

failure to accommodate claim is discussed first, before turning to an assessment of the plaintiff's

claim.

### 1.    *Legal Standard*

The Rehabilitation Act prohibits federal agencies from discriminating against disabled

individuals and also requires agencies to "mak[e] reasonable accommodations to the known

physical or mental limitations of an otherwise qualified individual with a disability who is an

applicant or employee, unless [the employer] can demonstrate that the accommodation would

impose an undue hardship." *Adams v. Rice*, 531 F.3d 936, 942–43 (D.C. Cir. 2008) (quoting 42

U.S.C. § 12112(b)(5)(A)) (alterations in original); *see also Taylor v. Rice,* 451 F.3d 898, 905

(D.C. Cir. 2006); *Klute v. Shinseki,* 840 F. Supp. 2d 209, 215 (D.D.C. 2012) (quoting *Nurriddin

v. Bolden,* 674 F. Supp. 2d 64, 82 (D.D.C. 2009)).  To determine an appropriate reasonable

accommodation, the agency should "initiate an informal, interactive process with the qualified

individual with a disability in need of accommodation."  29 C.F.R. § 1630.2(o)(3).  "'[A]n

employer is not required to provide an employee that accommodation [s]he requests or prefers,

the employer need only provide some reasonable accommodation.'"  *Aka v. Wash. Hosp. Ctr.*,

156 F.3d 1284, 1305 (D.C. Cir. 1998) (en banc)).

To survive summary judgment on a failure to accommodate claim, a plaintiff must "come forward with sufficient evidence to allow a reasonable jury to conclude that" she meets four elements: "(i) she was disabled within the meaning of the Rehabilitation Act; (ii) her employer had notice of her disability; (iii) she was able to perform the essential functions of her job with or without reasonable accommodation; and (iv) her employer denied her request for a reasonable accommodation of that disability." *Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014) (internal citations omitted); *Doak v. Johnson,* 798 F.3d 1096, 1105 (D.C. Cir. 2015); *Smith v. Lynch*, 106 F. Supp. 3d 20, 39 (D.D.C. 2015).

### 2.   *Analysis*

The record is undisputed the plaintiff was disabled during the pertinent time period and that the FBI had notice of her disability, thereby establishing the first two elements of a *prima facie* case for her failure to accommodate claim.  *See* Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 11, ECF No. 25.  The defendant does dispute, however, that the plaintiff could have performed the "essential functions of her job with or without reasonable accommodation."  *See generally id.* at 11-28.

"The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires;" it "does not include the marginal functions of the position."  29 C.F.R. § 1630.2(n).  "Evidence of whether a particular function is essential includes" several aspects: "(i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function;" as well as "[t]he terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs."  29 C.F.R. § 1630.2(n)(3).

In this case, the defendant has presented essentially unrebutted evidence that the plaintiff would not be able to fulfill the essential functions of the position by only working two hours per day. The plaintiff concedes as much, testifying that "I'm not saying that I would have been able to do all of the work in a two-hour in-office schedule, but I would have been able to perform any and all duties that I performed on any given project during those two hours." Pl.'s Dep. at 103:16-20. In particular, two "essential functions" of the plaintiff's position stand out. First, the volume of work associated with the plaintiff's job duties required that she work essentially full time. *See* Def.'s Mem. at 14-15. The plaintiff testified that she was required to work at least an eight-hour per day schedule, Pl.'s Dep. at 122:24-123:3, and that she often worked for nine or ten hours per day, *id.* at 25:2-4, 29:22-30:6, 31:9-13; *see also* Def.'s Mot., Ex. 5, Pl.'s Ans. Def.'s First Interrogatories, at 7, ECF No. 25-9 ("I worked full time for Sentinel . . . and I often put in nine or even ten-hour days.").

A second essential function of the plaintiff's job was her ability to participate in "impromptu" meetings, which often involved classified information requiring that she be present in person. The plaintiff concedes that meetings were an "important part" of her job, *see* Pl.'s Dep. at 59:11-17, and that she was constantly involved in meetings as an important part of her job, *see id.* at 36:15-18, 45:9-10 ("we would have impromptu meetings"), 46:23-47:2. The plaintiff also explained that her permanent position in the PMU required a commitment to "work collaboratively with the team," and that "[e]verything PMU does is time sensitive and is driven by external and internal deadlines," and that her colleagues "meet a lot." *Id.* at 95:1-7, 96:20-97:11, 117:18-25.

Given the full-time and meeting-heavy nature of the plaintiff's position, which required her in-person presence due to classified information, a maximum two-hours-per-day work

schedule does not appear to be enough time to satisfy just the *meeting* requirements of the job, let alone any of the plaintiff's other responsibilities.  Indeed, the plaintiff admits that just one "formal meeting," which frequently occurred, would itself last from one to two hours, *id.* at 53:18-23, and she concedes she "would not be able to attend all the meetings while [she] was in the office for just two hours," *id.* at 106:4-10.  The only rebuttal offered by the plaintiff is to suggest that, for meetings outside her proposed two-hour work window, she could "dial into those meetings."  *Id.* at 106:10-16; Pl.'s Opp'n at 23-24.  Yet, the plaintiff does not dispute that this solution would not have been viable for classified meetings, Pl.'s Dep. at 106:10-15, including "system security meetings," which she describes as "impromptu" and occurring "forever, constantly, and continuously," *id.* at 47:19-48:20.

Thus, the plaintiff effectively admits she could not perform the essential functions of her position by working only two hours per day.  Nevertheless, the plaintiff argues the defendant erred by "analyzing whether [the plaintiff] could do the essential functions of her job before she obtained the accommodations," namely working two hours per day, and asserts that "[o]nce she was given a chance to build up her strength, she would be able to handle more projects, [and] go to more meetings."  Pl.'s Opp'n at 18-19 (emphasis omitted).  In other words, the plaintiff appears to argue that she sought to return to work "gradually," and eventually, at some point, the plaintiff would have been able to perform the essential functions of her position.  *See, e.g.*, FAC ¶ 2; Pl.'s Opp'n at 2, 9, 18 (explaining that she could eventually return to full-time work "[o]nce she was given a chance to build up her strength" and that "Plaintiff was only seeking a two-hour day schedule as a stepping stone to a full return to work.").

The plaintiff's argument is not persuasive for at least two reasons.  First, as the defendant points out, by asserting that she would slowly and gradually be able to perform the functions of

her job, "[o]nce she was given a chance to build up her strength," the plaintiff admits she could

not perform the essential functions of her job at the time she requested the accommodation. *See*

Def.'s Reply at 3, ECF No. 38.

Second, and relatedly, the law is clear that a plaintiff alleging a failure to accommodate a

disability "must establish her ability to perform" the essential functions of her job "at the time

the employer denied her request for accommodation." *Minter v. District of Columbia*, 809 F.3d

66, 70 (D.C. Cir. 2015); *see also Basden v. Prof'l Transp., Inc*., 714 F.3d 1034, 1037 (7th Cir.

2013) (concluding that a plaintiff's "ability to come to work, or to otherwise perform the

essential functions of her job, is examined as of the time of the adverse employment decision at

issue"); *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) (holding that a plaintiff was not

qualified where he could not perform essential functions in the "present or in the immediate

future"); 29 C.F.R. § 1630.2(m) app. (EEOC Interp. Guidance) ("The determination of whether

an individual with a disability is qualified . . . should be based on the capabilities of the

individual . . . at the time of the employment decision.")).  Thus, as much as the plaintiff would

have liked to use a two-hour work day as a "stepping stone" to return gradually to full-time

work, this simply does not meet the requirement of being able to perform the essential functions

at the time of the requested accommodation, rather than at some later date.  The Rehabilitation

Act's provisions "contain no reference to an individual's future ability to perform the essential

functions of his position." *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995).  "To the contrary,

they are formulated entirely in the present tense, framing the precise issue as whether an

individual 'can' (not 'will be able to') perform the job with reasonable accommodation." *Id*.; *see*

42 U.S.C. § 12111(8) (stating that a reasonable accommodation claim adheres where, "with or

without reasonable accommodation," a plaintiff "*can* perform the essential functions of the employment position that such individual holds or desires" (emphasis added)).

Simply put, an agency is not legally bound by the Rehabilitation Act to provide any injured employee the opportunity to work a two-hour per day schedule, on an indefinite basis, on the chance that the employee *might*, at some point, gradually improve and be able to perform her position's essential job functions.  The law does not reach so far.  As they make clear, the plaintiff never gave a timeframe for when she might be able to work at least four hours per day, making it difficult for her to work a consistent and predictable work schedule.  *See Frazier-White v. Gee*, 818 F.3d 1249, 1256 (11th Cir. 2016) (where the "Plaintiff did not suggest a time frame for when she would be able to resume her full-duty position, and she later admitted . . . that she did not know how much time she needed or whether any amount of time would be sufficient," the "Plaintiff's request for an indefinite extension of light-duty status was unreasonable as a matter of law."); *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1048 (8th Cir. 1999) (holding that "[t]he fact that [the plaintiff] continued to heal, gain strength and . . . once again becom[e] a qualified individual who could perform the essential functions of the job, does not obviate the fact that she was not a qualified individual at the time" of termination); *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) ("Reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected.").

The D.C. Circuit's recent decision in *Doak v. Johnson* is illustrative of this point.  In *Doak,* the D.C. Circuit affirmed the grant of summary judgment to an agency that rejected an injured plaintiff's request to telecommute, with a two-hour start and end time "for a month or two."  *Doak,* 798 F.3d at 1101.  After denying this request, the agency subsequently terminated

the plaintiff for her inability to perform the essential functions of her job.  *Id.* at 1101-02.  The

Circuit explained that "even with her desired schedule accommodation, [the plaintiff] would

have been unable to perform an essential function of her job: being present in the office to

participate in interactive, on-site meetings during normal business hours and on a regular basis."

*Id.* at 1105.  Both the *Doak* plaintiff and the plaintiff here had positions that required

"[s]pontaneous meetings with various personnel" that "occur[ed] frequently" and "the pace of

work could sometimes be too fast for anything other than on-site presence."  *Id.* at 1106 (internal

quotation marks omitted).  Like the *Doak* plaintiff, the plaintiff in the instant case had to "be

present for interactive meetings during normal business hours" and the accommodations

requested "would not have enabled her to perform that function."  *Doak*, 798 F.3d at 1106-07;

*see also Minter*, 809 F.3d at 69-70 (holding that a claim for failure to accommodate could only

be made by one who is a qualified individual, *i.e.* able to perform the job's essential functions);

*Carr v. Reno,* 23 F.3d 525, 529–530 (D.C. Cir. 1994) (holding that an employer was entitled to

summary judgment where a plaintiff's position required physical presence to pick up and code

papers daily and her requested accommodation would not have enabled her to perform that

function); *Samper v. Providence St. Vincent Med. Ctr.,* 675 F.3d 1233, 1238 (9th Cir. 2012)

(holding that an employer was entitled to summary judgment where on-site attendance was an

essential function for a nurse and the plaintiff's requested schedule would not have enabled her

to perform that function sufficiently).

The plaintiff attempts to distinguish *Doak* on its facts, noting that the *Doak* plaintiff had

"frequent unscheduled absences," which "prevented her from participating in program meetings

and other work group collaboration."  Pl.'s Opp'n at 19 (quoting *Doak*, 798 F.3d at 1106

(alterations adopted)).  According to the plaintiff, the accommodations she requested "would

have permitted her to perform her job consistently." *Id.* This claim, however, lacks any evidentiary foundation and is contradicted by her own deposition testimony in which she confirmed that her team met frequently, that meetings were often "impromptu," and that they were an important part of her job. Pl.'s Dep. at 36:15-18, 45:9-10, 46:23-47:2, 59:11-17, 95:1-7, 96:20-97:11, 117:18-25. *See Doak*, 798 F.3d at 1106 (noting the plaintiff's claim that a late start time "would not have interfered with [her] ability to do [her] job" was "devoid of any detail, explanation, or evidentiary corroboration" and was "contradict[ed by] [the plaintiff's] own deposition testimony, in which she confirmed that . . . her job involved interactive meetings").

At bottom, the plaintiff's unsupported statements that she could perform the essential functions of her job with her requested accommodations "is insufficient to create a jury issue in light of overwhelming and undisputed evidence that included her own prior sworn testimony." *Id.* at 1107. Accordingly, the defendant is entitled to summary judgment as to the plaintiff's claim for failure to accommodate under the Rehabilitation Act.

**B.      Counts II and III: Disparate Treatment and Retaliation**

The plaintiff makes three additional claims in Counts II and III of the FAC. First, the plaintiff alleges the defendant discriminated against her because of her disability by refusing to allow her back to work. *See generally* FAC ¶¶ 101-13  Second, the plaintiff argues she was retaliated against for her EEO complaints because she was not included among the fifteen nominees for the 2012 Director's Award for Outstanding Information Management, *id.* ¶¶ 114-36, or among the nominees for the 2013 Attorney General's Award for Excellence in Information Technology, *id.* ¶ 137.

These claims fail, however, because the plaintiff has not shown that the defendant's proffered non-discriminatory reasons for not allowing her back to work and not nominating her

for the 2012 Director's Award are even remotely pretextual.  Further, the plaintiff cannot sustain her retaliation claim for not receiving the 2013 Attorney General's Award since that allegation was not administratively exhausted.  Each claim is assessed in turn.

### 1.   *FBI's Refusal to Allow the Plaintiff to Return to Work*

The plaintiff argues the "FBI refused to allow [her] to work because she became disabled."  FAC ¶ 102.  Courts analyze such "disability discrimination claims under the *McDonnell Douglas* burden-shifting framework."  *Doak v. Johnson*, 19 F. Supp. 3d 259, 271 (D.D.C. 2014) (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d at 1288-89).  Under the burden-shifting framework, the plaintiff must establish a "'prima facie case of discrimination by a preponderance of the evidence.  If the plaintiff establishes a prima facie case, the employer must then articulate a legitimate, non-discriminatory reason for its actions.  The plaintiff must then demonstrate that the employer's stated reason was pretextual and that the true reason was discriminatory.'"  *Id.* (quoting *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003)).  "A plaintiff can establish a *prima facie* case by showing that '(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'"  *Id.* (quoting *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002)).

In *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008), the D.C. Circuit clarified that, at the summary judgment stage, "the question whether the employee made out a *prima facie* case is almost always irrelevant."  Instead, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [a protected characteristic]."  *Id.* at 494.

The defendant has provided two legitimate, non-discriminatory reasons for refusing to allow the plaintiff to return to work on a two-hour-per-day work schedule, and the plaintiff has not produced any, let alone sufficient, evidence for a reasonable jury to find that these were not the actual reasons for the FBI's decision. *Id.*

First, the plaintiff's requested accommodation of a two-hour-per-day work schedule amounted to less than sixteen hours per week and was against FBI policy at the time. *See* Def.'s Mot., Ex. 8 at 1126-30, ECF No. 25-12 (FBI Policies on Part-Time Work); *see also id.*, Ex. 7 at FBI 3924, ECF No. 25-11 (FBI Work Schedule Policy Implementation Guide). Moreover, as discussed above, the defendant has established that the plaintiff could not perform the essential functions of her position with her proposed two-hour-per-day work schedule. *See supra* Part III(A)(2). Indeed, the plaintiff admits that she could not have initially performed the essential functions of her position on this schedule. Pl.'s Opp'n at 18-19. As she effectively concedes she could not initially perform the essential functions of her position, the plaintiff has failed to "respond with sufficient evidence to create a genuine dispute on th[is] . . . issue . . . by showing . . . that a discriminatory reason more likely motivated the employer . . . [or] that the employer's proffered explanation is unworthy of credence." *Doak,* 798 F.3d at 1107 (internal quotation marks omitted). Indeed, the fact that the plaintiff was receiving, and continued to receive for months after her requested accommodation, workers' compensation payments only underscores the fact that, at the time, the plaintiff was not prepared to perform the essential functions of her position. *See Soto-Ocasio v. Fed. Express Corp.*, 150 F.3d 14, 19-20 (1st Cir. 1998) ("[I]f an ADA plaintiff was receiving . . . disability benefits that were predicated on her *inability* to perform the job, then, to defeat a motion for summary judgment, she must make some type of showing that she was in fact *able* to perform the essential functions of her job

during the time in question.") (citing *Weigel v. Target Stores*, 122 F.3d 461, 468 (7th Cir. 1997)) (emphasis in original).

Second, even if the FBI wanted to accommodate the plaintiff, at the time she made the requested accommodation, the plaintiff was receiving FECA workers' compensation benefits for a disability and those benefits would have to stop. *See* Def.'s Mot., Ex. 14 at FBI 1671; 5 U.S.C. § 8116(a) (federal employees may not receive compensation while receiving FECA benefits). Thus, the FBI concluded that the only option available to the plaintiff was obtaining an AWA facilitated by the FBI's WCU and approved by DOL. *See* Pl.'s Opp'n at 4; Def.'s Mot., Ex. 14 at FBI 1671; *id.*, Ex. 20 at FBI 1583, Ex. 21 at FBI 2269. Yet, an AWA was not viable.[5] DOL would not approve a two-hour-per-day work schedule. Def.'s Mot., Ex. 22 at FBI 2313; Def.'s Reply, Ex. 37 at FBI 3704, ECF No. 38-2; Def.'s Reply, Ex. 38 at FBI 1338, ECF No. 38-3 (fax from DOL indicating that the claims examiner told the plaintiff that "a 2 hour a day job would not be deemed suitable").[6] Further, the plaintiff never confirmed the duties she would be able to

---

[5]     The plaintiff seizes on comments by Schlendorf made in response the plaintiff's May 18, 2012 email informing him that she was cleared by her doctor to work 2 hours a day on a "gradual limited schedule." Pl.'s Opp'n at 12-13; *see* Def.'s Mot., Ex. 10 at FBI 2218, ECF No. 25-14. Schlendorf replied: "That is great news and we look forward to getting you back on the team." Def.'s Mot., Ex. 10 at FBI 2218. Schlendorf also indicated that they hoped to "scope out a meaningful role that meets the requirements you notes [sic]." *Id.* Although the plaintiff makes much of these statements, the mere comment by one supervisor that the plaintiff could play a "meaningful role" by working limited hours does not indicate that the plaintiff's proposed accommodations were reasonable or that plaintiff could perform her essential job functions by working only two hours per day. Essential job functions are the "fundamental job duties" of an employee's position, and they include all but the "marginal functions" of a job. 29 C.F.R. § 1630.2(n)(1). A "meaningful role" does not imply that plaintiff could perform her "essential job functions." In any event, the next day, Schlendorf clarified his comments, stating that the plaintiff "should focus on her recovery, and when she reaches a point where she is medically cleared to work 4 hours a day, RPO w[ould] be happy to work with her on the [Alternative Work Assignment.]" Def.'s Reply, Ex. 36 at FBI 2219.
[6]     The plaintiff claims that the "FECA Manual now describes the minimum hours for a suitable job as 2-hours per day." Pl.'s Opp'n at 34. Assuming that is true, that has nothing to do with the instant case. At the time the plaintiff was seeking an AWA, DOL refused to authorize a 2-hour per day job offer, a fact that the plaintiff does not dispute. Def.'s Mot., Ex. 22 at FBI 2313 (Huff explaining that he spoke to Stephanie Stone, a Supervisory Claims Examiner at DOL, who informed him that DOL does not approve 2-hour job offers as "suitable"). In her Sur-Reply, the plaintiff disputes only whether *she* was told that DOL did not deem a two-hour per day job suitable. *See* Pl.'s Sur-Reply at 11-12, ECF No. 42; Pl.'s Dep. at 121-22 (plaintiff stating that she did not recall being told by a claims examiner that a "two-hour-a-day job would not be deemed suitable."). Whether DOL or the FBI so advised the plaintiff is immaterial given the undisputed documentary evidence that DOL's Supervisory Claims Examiner communicated to the *defendant* that a two-hour per day job would not be suitable. Def.'s Mot., Ex. 22 at FBI 2313.

perform as required.  *See* Def.'s Mot., Ex. 15 at FBI 2205-07 (exchanges between Stoddard, Schlendorf, and the plaintiff showing that the plaintiff had not "confirmed that the work duties were okay and appropriate for her medical circumstances").  As Huff confirmed, in order to write an AWA job offer, he had to have a "list of duties that [the plaintiff would] be performing." Def.'s Mot., Ex. 19 at FBI 2250.  According to Huff, however, the plaintiff could not commit to performing any specific job duties as she did not feel comfortable "trying to make deadlines with her work."  *Id.* at 2250-51.

Nevertheless, the plaintiff contends that the decision to deny the plaintiff's request to work two hours per day was "suspect" because the FBI could have used the "help."  Pl.'s Opp'n at 35.  The plaintiff misses the point.  Regardless of whether the FBI could have used her "help," they could not offer an opportunity for her to work two hours a day because it was, at the time, in violation of FBI and DOL policies.

Moreover, the plaintiff's supervisors all appear to have expressed serious concern about the plaintiff's health and well-being.  Huff told the plaintiff that all of her supervisors concluded that the plaintiff "need[ed] to concentrate on recovery efforts regarding [her] medical condition" and all "agreed that [the plaintiff] need[ed] to continue [her] recovery program and the most important issue [was her] long term health and well being."  Def.'s Mot., Ex. 18 at FBI 1836. Huff added that "[c]oming back to work at this point could jeopardize all the hard work and positive gains [she] ha[d] made thus far."  *Id.*  Moreover, Huff resisted submitting an AWA for the plaintiff, in part, due to concern that because of her "bad days," she would not be able to comply with an AWA's terms.  *Id.*  As noted, having "bad days" could have made it difficult for the plaintiff to maintain a consistent and predictable work schedule.  Huff believed this could

have led to a "denial of benefits." *Id.* Thus, if anything, her supervisors appear to have been looking out for the plaintiff's interests, rather than acting out any discriminatory animus.

The defendant has more than sufficiently supported its case that the plaintiff could not perform the essential functions of her job in 2012 and early 2013, and that her requested accommodation of a two-hour-per-day work schedule was contrary to FBI and DOL policies barring such limited hours and the grant of a "reasonable accommodation" to a person being compensated under FECA. In short, the plaintiff has presented no evidence suggesting that the FBI's "asserted non-discriminatory reason[s] w[ere] not the actual reason[s] and that the [FBI] intentionally discriminated against the [plaintiff] on the basis of [her disability]." *Brady v. Office of Sergeant at Arms*, 520 F.3d at 494. Accordingly, the defendant's motion for summary judgment is granted on Count II.

### 2. *Defendant's Failure to Award the 2012 Director's Award*

The plaintiff claims in Count III that she was retaliated against, after complaining to the OEEOA about the denial of her two-hour-per-day work schedule, when she was not included as a nominee for the non-monetary 2012 Director's Award. FAC ¶¶ 114-36. The defendant responds that the plaintiff has not adequately rebutted the defendant's proffered legitimate, non-discriminatory reason for denying her the award.[7] The Court agrees with the defendant.

---

[7] The defendant also argues that that the denial of the award was not an "adverse employment action" in the context of a *prima facie* retaliation claim under the Rehabilitation Act, Def.'s Mem. at 31-34, but this argument is not persuasive. While the D.C. Circuit has held that "not everything that makes an employee unhappy is an actionable adverse action," *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013), "[i]n the retaliation context the 'adverse action' concept has a broader meaning," and "reach[es] any harm that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Baird v. Gotbaum*, 662 F.3d 1246, 1249 (D.C. Cir. 2011) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The defendant does not dispute that the Director's Award is "among the highest honors employees may receive from the FBI." *Compare* FAC ¶ 55 *with* Def.'s Ans. ¶ 55. Thus, a reasonable employee could find that their removal from a list of nominees for the award, denying them the prestige of the award itself as well as the recognition from their peers and supervisors at the awards ceremony, would "dissuade" them from "making or supporting a charge" of discrimination or retaliation, or from requesting a disability accommodation. *Baird*, 662 F.3d at 1249. The Court assumes therefore, without resolving, that the plaintiff's exclusion from the list of nominees for the 2012 Director's Award constitutes an "adverse employment action" for the purposes of her retaliation claim.

The plaintiff has again "failed to cast any reasonable doubt on, or create any disputed question of material fact concerning," her protected activities or her employer's "asserted non-retaliatory reason for" denying her the award.  *Doak*, 798 F.3d at 1108.  Blake explained that he did not nominate the plaintiff for the 2012 Director's Award because he did not feel her contribution to Sentinel was critical to the success of the project because she was "mainly a conduit for the flow of information between the team and one entity" and "[s]he was not one of the managers overseeing the details of the project or one of the designers or programmers who created Sentinel."  Blake Statement at FBI 64.  Johnson, who made the final decision regarding the nominees, "emphasize[d] that hundreds of people contributed to the success of Sentinel" and that while the plaintiff "was certainly one of those contributors," Johnson felt "her contributions to the success of Sentinel were far exceeded by the 15 nominated for the Director's Award." Johnson Statement at FBI 58-59.

The plaintiff's efforts to raise a disputed fact regarding these non-pretextual reasons for the denial to her of the 2012 Director's Award fall flat.  First, she contends that all of the members of the Sentinel team received the award, and so did "every member of the Sentinel team who worked to [sic] the transition."  Pl.'s Opp'n at 38.  As the defendant notes, however, the plaintiff supports this statement only by reference to the FAC.  *See* Def.'s Reply at 21. Contrary to the plaintiff's contention that more than fifteen individuals could have been nominated, Pl.'s Opp'n at 40, Blake understood that only fifteen people could be nominated for the award, *see* Blake Dep. at 26:15, an understanding corroborated by the plain terms of the award guidelines expressly limiting the number for group nominations to fifteen "significantly contributing individuals," Def.'s Mot., Ex. 25 (Director's Award Guidelines), ECF No. 25-29; *see also* Johnson Statement at FBI 58 ("Only 15 people can be included when nominating a

group for the Director's Award . . . ."); Def.'s Reply, Ex. 43, Sworn Statement of Amy Waye, Unit Chief in the Awards and Recognition Unit, at FBI 69, ECF No. 38-8 (explaining that "group awards are limited to 15 employees, as specified in the Director's Award Nomination Guidelines").  Consequently, many members of the Sentinel team did not receive the award. *Compare* Def.'s Reply, Ex. 40 at FBI 532-35, ECF No. 38-5 (Sentinel project organizational chart) *with id.*, Ex. 41 at FBI 567-71, ECF No. 38-6 (list of recipients of the 2012 Director's Award); *see also* Johnson Statement at FBI 57 (stating that the Sentinel team who worked on the project from October 2010 through July 2012 was comprised of "approximately 50 people").

Next, the plaintiff compares herself to two members of the Sentinel team who did receive the award and claims that she performed similar work.  Pl.'s Opp'n at 39 (claiming her work was similar to award recipients Debra McDougal and Tiffany Martin).  At the outset, the plaintiff does not dispute that these two individuals deserved the award for their significant contributions to the project.  *See* Pl.'s Dep. at 140-41.  According to Blake, McDougal "knew every facet of the operation," and "her knowledge and her input was critical to the success of Sentinel," Blake Dep. at 51:20-22, 52:1-3, and Martin was not only a liaison, but also assisted with training, and provided value because of her experience of being from a "large office," *id.* at 56:15-22, 57:1-13. By contrast to these individuals, the plaintiff was away from work on disability for all of 2012 and, consequently, has simply not shown that any similarly situated employees received the award.

Finally, the plaintiff asserts that she was included on the February 2012 nominee list but omitted on the May 2012 list.  Pl.'s Opp'n at 37-38.  The plaintiff stopped working on the Sentinel project in September 2011, but admits that the most important parts of a development project occur near the end as it is readying deployment.  *See* Pl.'s Dep. at 134.  In this case, the

29

Sentinel project was delivered and adopted in July 2012, *see* Johnson Statement at FBI 57, and, thus, it makes sense that by mid-2012, the decision makers may have reassessed who among the team had made the most significant contributions to get the project over the finish line to completion, *see* Blake Dep. at 29:17-30:10, 37:13-17 (Blake stating that they reviewed the individuals who "had a larger impact toward the successful deployment of Sentinel"); *id.* at 76:18-77:17 (stating that a number of other individuals "fell off" the nominee list because others "had done more of the heavy lifting to get Sentinel to a state of delivery and success").

The plaintiff may feel strongly that she should have been nominated for the Director's award in lieu of others who also contributed to the Sentinel project. *See* Pl.'s Dep. at 131:2-3 (plaintiff testifying that it "doesn't make sense" that she was not nominated). Absent evidence of pretext, however, the law does not permit a plaintiff to redirect her hurt feelings or wounded pride about not being nominated for an award into a cognizable federal claim for retaliation. In this case, the defendant has provided substantial reasons for why the plaintiff was not included on the May 2012 list of nominees for the 2012 Director's Award. As much as the plaintiff may feel this decision was incorrect, she has failed to supply evidence that would persuade a reasonable jury that the reasons given for the decision are pretextual. *See Morris v. McCarthy*, 825 F.3d 658, 671 (D.C. Cir. 2016) (A "plaintiff cannot survive summary judgment merely by asserting that her employer made a bad decision. Rather, she must raise a genuine dispute over the employer's honest belief in its proffered explanation."); *see also Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (stating that "[o]nce the employer has articulated a non-discriminatory explanation for its action . . . the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers"

(alterations in original)).  The plaintiff's subjective feeling that it "didn't make sense" that she wasn't nominated is simply not sufficient to defeat a motion for summary judgment.

In short, the "record makes clear that [the Director's Awards] are discretionary" and the FBI "declined to reward [the plaintiff's] performance because, in management's estimation, [the plaintiff's] performance did not merit reward."  *Nurriddin v. Bolden*, 818 F.3d 751, 761 (D.C. Cir. 2016).  "Without evidence that a similarly situated employee received special recognition denied to [the plaintiff], or evidence [the defendant] is 'lying about the underlying facts that formed the predicate' for their decision not to confer a performance award," the Court "cannot conclude that [the FBI's] decision to withhold [her] discretionary award was discriminatory."  *Id.* (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d at 495).

Accordingly, the defendant is entitled to summary judgement on Count III as to the 2012 Director's Award.

### 3.    *Plaintiff's Failure to Exhaust Administrative Remedies with Respect to the 2013 AG's Award*

In the FAC, the plaintiff claims that her exclusion from the list of nominees for the 2013 Attorney General's Award for Excellence in Information Technology was retaliatory.  FAC ¶ 137.  The defendant moves to dismiss this claim for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, because the plaintiff has failed to exhaust her administrative remedies.  *See* Def.'s Mem. at 41-42.  The defendant is correct.

A plaintiff may file a Rehabilitation Act action in federal court only after exhausting her administrative remedies before the relevant federal agency for each allegedly discriminatory act.  *See Barkley v. U.S. Marshals Serv. ex rel. Hylton,* 766 F.3d 25, 34–35 (D.C. Cir. 2014) (citing *Spinelli v. Goss,* 446 F.3d 159, 162 (D.C. Cir. 2006)).  Under the Rehabilitation Act, a failure to exhaust administrative remedies is a jurisdictional defect, requiring dismissal for lack of subject-

matter jurisdiction under Rule 12(b)(1), because there would not be "any reviewable final administrative action at all." *Doak*, 798 F.3d 1096, 1103-04 (D.C. Cir 2015); *see Spinelli,* 446 F.3d at 162 (remanding case since "[t]he district court also should have dismissed [the plaintiff's] Rehabilitation Act claim for lack of jurisdiction on the ground that he failed to exhaust his administrative remedy," citing statutory language as "mandating administrative exhaustion"); *see also Barkley,* 766 F.3d at 34-35 (noting *Spinelli's* holding "that a district court lacks jurisdiction over a Rehabilitation Act claim if "there was no administrative complaint [filed] and thus no final disposition of one." (alteration in original)).   Since exhaustion of Rehabilitation Act claims is a jurisdictional requirement, the plaintiff has the burden to plead and prove it.   *See Spinelli v. Goss*, 446 F.3d at 162; *Dick v. Holder,* 80 F. Supp. 3d 103, 110 (D.D.C. 2015); *Mahoney v. Donovan*, 824 F. Supp. 2d 49, 58 (D.D.C. 2011), *aff'd*, No. 12-5016, 2012 WL 3243983 (D.C. Cir. Aug. 7, 2012); *Ellison v. Napolitano*, 901 F. Supp. 2d 118, 124 (D.D.C. 2012).   "A plaintiff fails to exhaust her administrative remedies when the complaint she files in federal court includes a claim that was not raised in the administrative complaint." *Latson v. Holder*, 82 F. Supp. 3d 377, 384 (D.D.C. 2015) (quoting *Mogenhan v. Shinseki,* 630 F. Supp. 2d 56, 60 (D.D.C. 2009)).   "This exhaustion requirement is not a 'mere technicality,' but 'serves the important purposes of giving the charged party notice of the claim and narrow[ing] the issues for prompt adjudication and decision.'"   *Id.* (quoting *Park v. Howard Univ.,* 71 F.3d 904, 907 (D.C. Cir. 1995); *see also Singleton v. Potter,* 402 F. Supp. 2d 12, 32 (D.D.C. 2005) ("[A]s the D.C. Circuit has emphasized: 'Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to

file a timely EEOC charge.'" (quoting *Marshall v. Fed. Express Corp.,* 130 F.3d 1095, 1098 (D.C. Cir. 1997))).

The plaintiff's second and last administrative complaint in October 2012 did not mention the 2013 Attorney's General's Award.  *See* Def.'s Mot., Ex. 30, Pl.'s October 2012 Admin. Compl. at FBI 13-14, ECF No. 25-34.  Indeed, the plaintiff does not even contend that her claim was raised at the administrative level.  *See* Pl.'s Opp'n at 44.  Instead, the plaintiff requests that this failure to exhaust be excused because the FBI is applying "an overly technical approach to exhaustion requirements."  *Id.*  In her view, her retaliation claims regarding both the Director's and Attorney General's Awards "grew out of the same conduct" and "thus the claims are like and reasonably related."  *Id.* (citing *Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 55-56 (D.D.C. 2012)) (internal quotation marks omitted).  The plaintiff contends that her Director's Award complaint "had already given the agency a chance to act, and, thus, [her] Attorney General's Award claim should not be dismissed."  *Id.* (alterations adopted).

The D.C. Circuit has made clear, however, that "for a charge to be regarded as 'reasonably related' to a filed charge . . . it must [a]t a minimum . . . arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination."  *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010).  "This connection is necessary to give the agency 'an opportunity to resolve [the] claim administratively before [the employee] file[s] her complaint in district court.'"  *Id.* (quoting *Wiley v. Glassman,* 511 F.3d 151, 160 (D.C. Cir. 2007)).  In this case, however, the plaintiff did not learn that she was excluded from the 2013 Attorney General's Award until the Fall of 2014, *see* Pl.'s Opp'n at 44, and it was not included in her initial October 28, 2014 complaint filed in this Court, but was only added in the March 23, 2015 FAC.  *Compare* Pl.'s Compl., ¶¶ 103-12, ECF No. 1 *with* FAC ¶ 137.  This was more than two

years after her second administrative complaint and more than a year after the investigation into her administrative retaliation claim concluded. *See* Def.'s Reply, Ex. 44, ECF No. 38-9 (excerpts of the administrative Report of Investigation dated received on February 13, 2013). Thus, as the defendant points out, Def.'s Reply at 28, "her claim concerning the retaliatory conduct" regarding the 2013 Attorney General's Award "could not possibly have arisen from the administrative investigation" that concluded before she was even aware that she was excluded from the 2013 award, *Payne*, 619 F.3d at 65. "This is necessarily so because the administrative investigation of those complaints ended . . . well before" the fall of 2014. *Id.* Thus, the plaintiff failed to exhaust her retaliation claim with respect to the 2013 Attorney General's award. *See Latson*, 82 F. Supp. 3d at 384 ("A plaintiff fails to exhaust her administrative remedies when the complaint she files in federal court includes a claim that was not raised in the administrative complaint." (quoting *Mogenhan,* 630 F. Supp. 2d at 60); *see also Marshall,* 130 F.3d at 1098; *Howard Univ.,* 71 F.3d at 907. Accordingly, to the extent that the plaintiff's retaliation claim in Count III is predicated on allegations regarding the 2013 Attorney General's Award, that claim is dismissed.

## IV.    CONCLUSION

The plaintiff has not raised a genuine issue of material fact as to whether she could have performed the "essential functions" of her position after her injury in September 2011 and until her return to part-time work in 2013. Moreover, the plaintiff has not produced sufficient evidence for a reasonable jury to find that the defendant's proffered non-discriminatory reasons for not allowing her to return were not the "actual reasons" and that the FBI intentionally discriminated against her based on her disability. The plaintiff has also not shown that the defendant did not have legitimate, non-discriminatory reasons for excluding her from the list of

nominees for the 2012 Director's Award.  Finally, because the plaintiff did not raise her

allegation regarding the 2013 Attorney General's award in her administrative complaints, that

claim is unexhausted and must be dismissed.  Accordingly, the defendant's Motion to Dismiss

and for Summary Judgment is GRANTED.

      Date: March 30, 2017

                              _____

                              BERYL A. HOWELL
                              Chief Judge